AETNA LIFE INSURANCE CO.

v.

**Henry PARKER, as Treasurer of the State of Connecticut, and State of Connecticut.**

Civ. No. H–84–983(AHN).

United States District Court,
D. Connecticut.

June 29, 1988.

Thomas J. Groark, Ann McClure, Alan B. Taylor, Day, Berry & Howard, Hartford, Conn., for plaintiff.

Brewster Blackall, William Prensky, Asst. Atty. Gen., Hartford, Conn., for defendants.

### ORDER

NEVAS, District Judge.

Over objection and after a careful review, the Magistrate's Recommended Ruling is hereby adopted, ratified and approved. SO ORDERED.

### RECOMMENDED RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOAN GLAZER MARGOLIS, United States Magistrate.

On September 10, 1984, plaintiff Aetna Life Insurance Company ("plaintiff" or "Aetna") brought this action for injunctive and declaratory relief pursuant to Section 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3); in its second amended complaint, filed December 24, 1986, plaintiff contends that the defendants State of Connecticut ("Connecticut" or "State") and its state treasurer have improperly demanded surrender under Connecticut's escheat stat-

ute, Conn.Gen.Stat. § 3–64a[1], of more than $2,500,000 in uncashed checks and drafts issued in payment of individual benefits under ERISA plans. In their counterclaim, filed April 3, 1987, defendants assert that the unclaimed drafts constitute abandoned property to which they are entitled under the state escheat statute.

A Joint Stipulation of Facts ("Jt. Stip.") was filed on December 15, 1987. On January 15, 1988, defendants filed a motion for summary judgment; plaintiff's cross-motion for summary judgment was filed on January 19, 1988.[2] Reply briefs were filed on January 29, 1988. Lengthy oral argument was held on April 8, 1988. The sole legal issue raised here is whether the Connecticut escheat statute is preempted by ERISA.

For the reasons stated herein, plaintiff's motion for summary judgment is granted and accordingly defendants' motion for summary judgment is denied.

## I. FACTS

The following facts are undisputed:

Plaintiff Aetna provides group and accident insurance to various employee benefit plans, some of which are subject to ERISA. (Jt.Stip. ¶ 3).

On April 8, 1982, Aetna entered a settlement agreement with the State in the amount of $7,131,772.71 regarding escheatment of Aetna's statutory obligations through 1981, including drafts issued under ERISA plans prior to ERISA's effective date. (Jt.Stip. ¶ 37, Exh. A). Aetna charged these amounts to ERISA and non-ERISA plans equally. (Jt.Stip. ¶ 38). For drafts issued subsequent to the period covered by the settlement, Aetna now charges escheatable amounts directly to the plan under which the amounts arose. (Jt.Stip.

¶ 39). All outstanding drafts issued under life insurance policies prior to 1983 have been surrendered to the State regardless of the ERISA status of those policies. (Jt. Stip. ¶ 40). The parties agree that more than $2,500,000 in claim payment drafts issued by Aetna under ERISA plans prior to January 1, 1985 remain outstanding. (Jt.Stip. ¶ 33).

Aetna determines the amount of the premium it charges to the members of each insured group by an accounting procedure called "experience rating." (Jt.Stip. ¶ 8). Aetna bases premiums for the ensuing year on the amount actually paid in claims to members of that group during the previous year. (Jt.Stip. ¶ 8). Aetna does not include a claim from the previous year into its loss experience until the claim payment draft has cleared banking channels ("presented basis accounting"). (Jt.Stip. ¶¶ 10, 17). Only pharmacy and repetitive payment claims are charged to the appropriate plan at the time the drafts are issued ("issued basis accounting"). (Jt.Stip. ¶¶ 41, 18). Most of Aetna's competitors use "issued basis accounting" for *all* claims paid to the various insured groups. (Jt.Stip. ¶ 19).

Unrecoverable losses are also figured into the experience rating formula, while experience surpluses are either refunded or credited to the policyholder. (Jt.Stip. ¶¶ 11, 13). Deficits are recovered from future premiums. (Jt.Stip. ¶ 13).

When Aetna's payment for covered services does not clear banking channels during the policy year, Aetna sets aside a reserve fund for payment of these claims based upon the group's claims history. (Jt. Stip. ¶ 10). The company honors such unpaid drafts even when they are over three years old. (Jt.Stip. ¶ 10).

---

1. Conn.Gen.Stat. § 3–64a is one of several statutes concerning escheat of property to the State. *See* Conn.Gen.Stat. §§ 3–56a to –74a. Section 3–64a provides in full:

   All property not otherwise provided for or excluded from this part, including any income, interest or other increment thereto and deducting any lawful charges, which is held or owing in this state and has remained unclaimed by the owner for more than three

years after it became due, payable or distributable, is presumed abandoned.

2. Plaintiff's Local Rule 9(c) Statement incorporates the Stipulation of Facts in its entirety. Defendants' Local Rule 9(c) Statement incorporates all but §§ 34 and 39. Accordingly, the Court will not consider these latter two paragraphs.

When an ERISA plan is cancelled or terminated, Aetna continues to pay claims submitted under the plan in the usual manner after a period of two years. (Jt.Stip. ¶ 29). Two years after the plan ends, the company returns reserve funds to the Plan, but it deducts a 2% residual for unrecorded claims which may subsequently be presented under the terminated plan. (Jt.Stip. ¶ 14). Once final accounting has taken place, about two years after cancellation of a plan, Aetna no longer charges the plan for outstanding drafts subsequently presented for payment. (Jt.Stip. ¶ 29).

By the terms of its contracts with policyholders, Aetna may set the experience credit amount. (Jt.Stip. ¶ 22). On occasion Aetna has negotiated the amount with ERISA plans and has made adjustments to prevent policyholders from terminating or cancelling their policies. (Jt.Stip. ¶¶ 23, 24).

The limitations of Aetna's previous filing system prevent identification of the specific ERISA plans or payees to whom outstanding claim drafts issued prior to January 1, 1982 should be charged. (Jt.Stip. ¶ 25). Aetna did not attempt to contact those ERISA draft payees. (Jt.Stip. ¶ 26). Aetna also does not know which outstanding drafts for January 1, 1975 through December 31, 1983 were issued under ERISA plans and under non-ERISA plans. (Jt. Stip. ¶ 33). However, it sent contact letters to payees of outstanding drafts of over $250 issued during 1982 and to payees of drafts over $100 issued in 1983 or later, regardless of ERISA status. (Jt.Stip. ¶ 26). Aetna does not seek payees of outstanding drafts through publication. (Jt.Stip. ¶ 27). It has no record of which ERISA plans have been terminated or cancelled. (Jt. Stip. ¶ 28).

Aetna could not apply any loss due to funds escheated by the state to premium increases for ERISA plans cancelled or terminated prior to November 1, 1984 because it cannot charge a plan's loss experience with funds paid out more than two years after cancellation or termination of the plan. (Jt.Stip. ¶¶ 30, 31).

## II. DISCUSSION

### A. *Preemption*

Section 514(a) of ERISA explicitly provides that the provisions of ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" under ERISA. 29 U.S.C. § 1144(a). As the United States Supreme Court stated in *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981) (*"Alessi"*), § 1144(a) was "meant to establish pension plan regulation as exclusively a federal concern." (footnote omitted). The *Alessi* Court drew upon the definition of "State" found in 29 U.S.C. § 1144(c)(2) [3] to hold that "even indirect state action bearing upon private pensions may encroach upon the exclusive federal concern." *Id.* at 525, 101 S.Ct. at 1907.

Section 1144(a) was given an equally broad construction in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (*"Shaw"*). There the Court quoted from legislative testimony that ERISA was

... intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principal is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.

*Id.* at 99, 103 S.Ct. at 2901, *quoting* 120 Cong.Rec. 29933 (1974). Thus the Court ruled that the "breadth of [§ 1144(a)'s] preemptive reach is apparent from that section's language." 463 U.S. at 96, 103 S.Ct. 2899 (footnote omitted). It further held that a law "relates to" an ERISA plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 97, 103 S.Ct. at 2900 (footnote

---

**3.** This section reads in full:

The term "State" includes a State, any political subdivision thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

omitted). The Supreme Court later stated that *Shaw* gave this phrase a "broad common-sense meaning." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (*"Metropolitan v. Massachusetts"*).

While recognizing that the *Shaw* court accorded § 1144(a) a broad and liberal construction, the Second Circuit nonetheless characterized the preemptive scope of ERISA as "neither all-encompassing ... nor unlimited ..." *Rebaldo v. Cuomo,* 749 F.2d 133, 138 (2d Cir.1984), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985) (citations omitted) (*"Rebaldo"*). Like the Supreme Court in *Alessi,* the Second Circuit referred to § 1144(c)(2), which defines the term "State," [4] to restrict the preemptive effect of ERISA to only those state laws which "purport[ ] to regulate, ... the terms and conditions of employee benefit plans ..." [5]

As defendants appropriately point out, escheat of unclaimed property is an area of traditional state control, rooted in English common law and adopted in this country after the American Revolution. (Defendants' Brief at 9–10). Indeed, the Second Circuit on two occasions found no preemption by ERISA of two New York statutes which involved the exercise of the state's police powers. *E.g., Rebaldo, supra,* 749 F.2d at 138–40 (statute directed to containment of hospital costs); *American Telephone & Telegraph Co. v. Merry,* 592 F.2d 118, 122 (2d Cir.1979) (*"Merry"*) (state domestic relations statute) (cited with approval in *Shaw, supra,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21). However, that factor in and of itself appears insufficient to vitiate ERISA's preemptive effect. *See,*

*e.g., Alessi, supra* (workers' compensation statute); *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 326–28 (2d Cir.1985), *aff'd mem. sub. nom. Roberts v. Burlington Industries, Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986) (*"Gilbert"*) (New York wage collection statutes); *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 328–30 (2d Cir.1982), *aff'd mem. sub nom. Arcudi v. Stone & Webster Engineering Corp.,* 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983) (*"Stone & Webster"*) (Connecticut workers' compensation statute); *Bartucca v. Katy Industries, Inc.,* 668 F.Supp. 111, 113–14 (D.Conn.1987) (Connecticut wage collection statutes).

Defendants here emphasize that the Connecticut escheat statute is too remotely related to an ERISA plan to be preempted under § 1144(a). Defendants rely upon the Supreme Court's cautionary language, in a footnote in *Shaw,* that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. This was a significant factor, among others,[6] in the *Rebaldo* decision, where the Second Circuit ruled that ERISA does not preempt a New York statute which limited a hospital's ability to set inpatient charges for self-insured employee benefit plans, as such statute did not "relate" to the terms and conditions of employee benefit plans:

ERISA does not invalidate those State statutes whose effect on pension plans is simply tangential in nature.... This conclusion follows as a matter of common sense from the fact that ERISA plan members and managers are bound

---

**4.** *See* note 3 *supra.*

**5.** Only the Second Circuit and the Ninth Circuit have suggested that § 1144(c)(2) limits the preemptive scope of § 1144(a). *See also Martori Bros. Distributors v. James–Massengale,* 781 F.2d 1349, 1359 (9th Cir.), *amended on other grounds,* 791 F.2d 799 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 385 (1986). The Sixth Circuit expressed disapproval of this analysis but declined to rule upon it in *Authier v. Ginsburg,* 757 F.2d 796, 799 n. 4 (6th Cir.), *cert. denied,* 474 U.S. 888, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985). The Fifth Circuit similarly

expressed no opinion on this issue in *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1467 n. 9 (5th Cir.), *reh. denied en banc,* 797 F.2d 977 (5th Cir.1986), *cert. denied sub nom. Corrigan v. Sommers Drug Stores Co.,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837, *cert. denied sub nom. Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987).

**6.** *See* text accompanying notes 4–5 *supra.*

to engage in myriad transactions that Congress never considered when it drafted [§ 1144(a)]. A preemption provision designed to prevent state interference with federal control of ERISA plans does not require the creation of a fully insulated legal world that excludes these plans from regulation of any purely local transaction.

749 F.2d at 138 (citations omitted). As the Second Circuit observed, state and municipal regulation of zoning, health, and safety matters also affect the operations of ERISA trusts, but such regulations clearly are not pre-empted by ERISA. *Id., quoting Lane v. Goren,* 743 F.2d 1337, 1340 (9th Cir.1984) (*"Lane"*).

In *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1465–67 (5th Cir.), *reh. denied en banc,* 797 F.2d 977 (5th Cir.1986), *cert. denied sub nom. Corrigan v. Sommers Drug Stores Co.,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837, *cert. denied sub nom. Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987) (*"Sommers"*), the Fifth Circuit reviewed numerous appellate decisions construing this "remoteness" exception, including *Merry, Rebaldo, Gilbert* and *Lane.* The Fifth Circuit analyzed this line of cases as follows:

These cases are not easily distilled into a simple test for determining whether a state law of general application affects employee benefit plans in too tenuous, remote, or peripheral a manner to be preempted. The courts appear to consider two principal facts. First, if the state law involves an exercise of traditional state authority, then the courts are less likely to find that it relates to a benefit plan than if it involves a state attempt to regulate an area not traditionally left to the states....

Second, the courts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—than if it affects relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan....

793 F.2d at 1467 (citations omitted).

In addition to these two factors identified by the Fifth Circuit in *Sommers,* the Second Circuit in *Rebaldo* placed a further emphasis on whether the state law had a direct economic impact on the administration of the ERISA plan. The court reasoned that all state interaction with economic activity, whether in the areas of public utility services, minimum wage regulation, rent control, and highway tolls, has some economic impact upon ERISA plans. 749 F.2d at 138. But, the court continued:

... if ERISA is held to invalidate every State action that my increase the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress. Where as here, a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated.

*Id.* at 138–39 (footnote omitted). *Rebaldo* was distinguished in *Gilbert,* in that the state law claims in the latter decision concerned determination of whether any benefits were paid, and thus "directly affect[ed] the administration of benefits under the plan." 765 F.2d at 327. *See also Sforza v. Kenco Constructional Contracting, Inc.,* 674 F.Supp. 1493, 1494 n. 4 (D.Conn.1986) (*"Sforza"*) (explaining that the Second Circuit "clarified its position" on this issue in *Gilbert*).

This distinction was one of several significant factors in *Fort Halifax Packing Co. v. Coyne,* —— U.S. ——, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (*"Fort Halifax"*), concerning a Maine statute which required employers to provide a one-time severance payment to employees upon the closing of a plant. Since the Maine statute required a one-time payment, the state law did not impact upon the administration of an ERISA plan. As the Court explained:

It is ... clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations....

*Id.* 107 S.Ct. at 2217 (citation omitted). *See also Totton v. New York Life Ins. Co.*, 685 F.Supp. 27 (D.Conn.1988) (in post-*Fort Halifax* decision, plaintiffs' state breach of contract claim held not to be pre-empted by ERISA, as such claim did not impact upon administration of the ERISA plan).

In applying these analyses to the undisputed facts and legal issues here, it would appear that under these circumstances, the Connecticut escheat statute has been preempted by ERISA. There can be no doubt that the escheat of unclaimed property is an area of traditional state control and has been since this nation's inception. However, if the uncashed checks and drafts were escheated to the State, the escheat statute *would* affect relations with principal ERISA entities, namely the beneficiaries who would now be directed to the State to seek payment, since the state becomes responsible for a claim upon payment or delivery of excepted money or property to the treasurer. Conn.Gen.Stat. §§ 3–62g & –67a. The Connecticut escheat statutes set forth an elaborate procedure by which a person makes a claim for return of escheated property. The process is commenced by filing a verified petition with the state treasurer, who may hold hearings himself or may refer the matter to the claims commissioner for his recommendation. Conn.Gen.Stat. §§ 3–62f(a), (b) & 3–70a(b). The treasurer must issue a written decision, with findings of fact and a statement of reasons; no claims are to be paid without written approval of the attorney

general. Conn.Gen.Stat. §§ 3–62f(b) & 3–70a(b), (c). Any person aggrieved by the state treasurer's decision may file an appeal in the superior court in the judicial district of Hartford–New Britain, in accordance with Conn.Gen.Stat. § 4–183. Conn. Gen.Stat. §§ 3–62f(b) & 3–72a. The court may impose double or triple costs against the claimant, if the appeal was taken without probable cause. Conn.Gen.Stat. §§ 3–62f(b), 3–71a. Thus, application of the escheat statute would have a direct effect upon the administration of benefits under the various ERISA plans. And lastly, given the magnitude of the sums at dispute here, there will be a direct economic impact on the administration of ERISA plans, unlike in *Rebaldo*. Defendants are correct that many of the underlying ERISA plans have been terminated, so that presentment of outstanding drafts would have no immediate impact on an employer's "experience rating." However, even with respect to cancelled or terminated plans, plaintiff maintains reserve or residual funds for a specified period of time. And most significantly, as plaintiff's counsel indicated at oral argument, were the escheat statute to apply, plaintiff would switch from presented basis accounting to issued basis accounting, which could have an adverse impact upon insurance premiums for all ERISA plans.

An analogous issue was presented in *Blue Cross & Blue Shield of Florida, Inc. v. Department of Banking & Finance*, 791 F.2d 1501 (11th Cir.), *reh. denied en banc*, 797 F.2d 982 (11th Cir.1986), involving a federal employees' health benefit program, coordinated on a nationwide basis by the plaintiff insurance company. The State of Florida demanded that all checks issued to beneficiaries under the plan which remained uncashed for seven years escheat to the State, under its Unclaimed Property Act. The federal Office of Personnel Management ("OPM") contrarily argued that the state law was pre-empted by virtue of 5 U.S.C. § 8902(m)(1), which provides that any federal health benefit contract

which relate[s] to the nature or extent of coverage or benefits (including payments

with respect to benefits) shall supersede and preempt any State or local law ... which relates to health insurance or plans to the extent such law or regulation is inconsistent with such contractual provisions.

In order to resolve this dispute, plaintiff commenced an interpleader action, the central question being whether the Florida escheat statute was one "which relate[d] to health insurance or plans." The Eleventh Circuit relied primarily upon the *Shaw* decision, as it saw "no meaningful difference on the face of the statute between Congress' use of 'relates to' in ERISA and its use of the same words in section 8902(m)." 791 F.2d at 1504. The Eleventh Circuit gave "great deference" to the OPM's reasonable conclusion that the state unclaimed property law "relate[d] to" health insurance or plans, over the contentions of the state defendants that such relation was too "remote." *Id.* at 1505–06. Thus, the court held that the Florida escheat statute was preempted by the federal contract. *Id.* at 1506.[7]

Accordingly, given the totality of the pertinent factors, this court finds that to the extent defendants seek entitlement to more than $2,500,000 in uncashed checks and drafts issued by plaintiff in payment of individual benefits under ERISA plans, the Connecticut escheat statute, Conn.Gen. Stat. § 3–64a, is preempted by ERISA.

## B. *Insurance Saving Clause*

■ Defendants further suggest that even if preemption were appropriate under § 1144(a), the state statute would fall un-der the "insurance saving clause" found in § 1144(b)(2)(A), which provides that "... nothing in this subchapter shall be construed to exempt or relieve any person from, any law of any State which regulates insurance, banking or securities."

The insurance saving clause was at issue in *Metropolitan v. Massachusetts, supra,* which involved a Massachusetts statute requiring specified minimum mental-health benefits in certain insurance policies. These two pre-emption statutes, the Court wrote, "while clear on their faces, perhaps are not a model of legislative drafting ..." 105 S.Ct. at 2389. The Court adopted the three-part test utilized to construe the phrase "business of insurance" under the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.:*

> *first,* whether the practice has the effect of transferring or spreading a policy holder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

Id. at 2391, *quoting Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982) (emphasis in original). The Supreme Court found that all three elements were met, so that the mandated-benefit law was "saved from pre-emption by the operation of the saving clause." 105 S.Ct. at 2391–92 (footnote omitted). The Court further rejected the insurance company's claim that the saving clause was entitled to a narrow construction. *Id.* at 2392–93.

---

**7.** On May 9, 1988, after this recommended ruling already was in draft, defense counsel forwarded to the Magistrate copies of two recent unreported decisions. Plaintiff's counsel forwarded a letter in response on May 13, 1988. The first, and more significant, decision was *Attorney General v. Blue Cross & Blue Shield of Michigan,* 168 Mich.App. 372, 383, 424 N.W.2d 54 (1988), in which the court held, that ERISA does not preempt the Michigan escheat law, relying primarily upon *Rebaldo, supra.* As plaintiff's counsel correctly points out, the factual record there was not as well developed as that here, where a direct impact upon the administration of ERISA plans is clear.

In the second decision, *National Elevator Industry Pension, Welfare & Educational Funds v. Scrivani,* Dkt. No. 241175 (Conn.Super.Ct. Feb. 8, 1988), a Connecticut Superior Court judge held that a claim under the Connecticut Unfair Trade Practices Act against a corporate officer and shareholder who failed to make contributions to a pension fund was not preempted by ERISA, again relying primarily upon *Rebaldo, supra.* As plaintiff's counsel appropriately argues, the *Scrivani* ruling appears to be in conflict with *Sforza, supra,* in which Judge Nevas found that ERISA preempts a Connecticut statute which imposes civil and criminal liability on corporate officers who fail to make required pension payments. 674 F.Supp. at 1493–96.

Application of the three-part test led to a different result, however, in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 1554–55, 95 L.Ed.2d 39 (1987) (*"Pilot Life"*), involving a plaintiff's state law claim of bad faith against any insurance company. The Court reviewed the various contexts in which this claim had been applied in the Mississippi courts and found that a "common-sense understanding of the phrase 'regulates insurance' does not support the argument that the Mississippi law of bad faith falls under the savings clause." *Id.* 107 S.Ct. at 1554. Thus the Court held that this state claim was pre-empted under § 1144(a). *Id.* at 1558. *See also Northern Group Services, Inc. v. Auto Owners Ins. Co.,* 833 F.2d 85, 89–90 (6th Cir.), *reh. denied en banc sub. nom. Northern Group Services, Inc. v. State Farm Mut. Auto Ins. Co.,* 9 E.B.C. 1376 (6th Cir.1987) (coordination of benefits section of Michigan No–Fault Automobile Insurance Act "clearly" "regulates insurance"); *General Motors Corp. v. California State Board of Equalization,* 815 F.2d 1305, 1310 (9th Cir.), *reh. denied,* 824 F.2d 816 (9th Cir.1987), *cert. denied sub nom. General Motors Corp. v. Bennett,* — U.S. ——, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988) (state law on gross premiums received by insurance companies doing business in California is within purview of insurance saving clause, as such tax is "intimately associated with the business of insurance").

None of the three factors set forth in *Metropolitan v. Massachusetts, supra,* are applicable here—the escheat statute does not have the effect of transferring or spreading a policyholder's risk, it is not an integral part of the policy relationship between the insurer and the insured, and it is not limited to entities within the insurance industry. The escheat statutes apply to a variety of circumstances—property held by banking organizations, Conn.Gen.Stat. § 3–57a; funds held by life insurance corporations, Conn.Gen.Stat. § 3–58a; property held by or ownership in a business association, Conn.Gen.Stat. §§ 3–59a & –59b;

property distributable on dissolution of business, Conn.Gen.Stat. § 3–60; property held by fiduciaries, Conn.Gen.Stat. § 3–61a; property held by public bodies or officers, Conn.Gen.Stat. § 3–62a; property held by federal courts or agencies, Conn.Gen.Stat. § 3–62b; property in decedent's estates, Conn.Gen.Stat. § 3–63a; and unclaimed intangible property, Conn.Gen.Stat. § 3–65a. The statute at question here, Conn.Gen. Stat. § 3–64a,[8] has been applied to the escheat of shares of public utility holding company stock and dividends. *See Matter of Northeast Utilities,* 479 F.Supp. 194 (D.Conn.1979). Thus, as in *Pilot Life, supra,* a common-sense understanding of the phrase "regulates insurance" leads to the conclusion that the Connecticut escheat law does not fall under the insurance saving clause.[9]

## III. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is granted and defendants' motion for summary judgment is denied.

*See* 28 U.S.C. Section 636(b) (written objections to ruling must be filed within ten days after service of same); F.R.Civ.P. 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut.

Dated at New Haven, Connecticut, this 23rd day of May, 1988.

---

**8.** *See* note 1 *supra.*

**9.** In light of the conclusions reached in Parts II.A. & B., there is no reason to reach the other issues raised by the parties.